IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANIEL THOMAS LANAHAN, #345-275 *
        Plaintiff
    v.                         *     CIVIL ACTION NO. AW-09-3208

EASTERN CORRECTIONAL INSTITUTION *
et al.,
        Defendants         *

MEMORANDUM OPINION

Pending is Defendant's Motion to Dismiss or for Summary Judgment[1] (ECF No. 23), which is unopposed.[2] Upon review of papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

**Background**

By way of amended complaint, Plaintiff alleges that at the time he was transferred to the custody of the Division of Corrections he was on suicide watch at the Carroll County Detention Center. Rather than being sent to Patuxent Institution for evaluation and/or treatment he was sent to the North Branch Correctional Institution ("NBCI"). ECF No. 6. In September, 2007, a state court judge signed an order directing that Plaintiff be transferred to Patuxent Institution. The order was ignored. Instead, in January, 2008, Plaintiff was transferred to Jessup Correctional Institution ("JCI"). In December, 2008, he was transferred to Eastern Correctional Institution ("ECI"). *Id*.

Plaintiff alleges during the four months he was incarcerated at ECI, from December, 2008 through April, 2009, he was not housed on the mental health tier, but rather on a gang unit. He states that his mental health condition worsened and in April, 2009, he cut his wrists, tried to eat razor blades, and attempted to hang himself. He also states that he jumped off the sink and hurt his neck but was not sent to the hospital for x-rays. He was later transferred to Patuxent Institution by ECI administration after the psychology staff refused to send him. ECF Nos. 1 & 6. Plaintiff states that the failure to send him to the mental health unit deprived him of constitutionally adequate

---

[1] Lt. Ragin has not been properly served with the Complaint. Plaintiff's sole allegation against Lt. Ragin is that he did not follow through with efforts to have Plaintiff transferred to Patuxent Institution. ECF No. 6. For the reasons that follow, even if he had been properly served, Plaintiff's complaint against Ragin would be subject to dismissal.

[2] Plaintiff was given the requisite notice and an opportunity to oppose the dispositive motion in compliance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and has failed to do so.

medical care and has worsened his condition such that he is not able to participate in programming which would diminish his time of incarceration. *Id*.

In response, Defendants assert that Plaintiff was received at the Maryland Reception Diagnostic and Classification Center on August 3, 2007, transferred to Western Correctional Institution on August 20, 2007 ECF No. 23, Ex 1. On October 3, 2007, an amended commitment record was issued reflecting changes to Plaintiff's sentence. At that time the sentencing court recommended Plaintiff be placed in the Patuxent Institution. *Id*., Exs. 1, 2 & 3.

On January 24, 2008, Plaintiff was transferred to JCI as a "swap" ordered by DOC Headquarters. *Id*., Exs. 1 &2. Thereafter, Plaintiff was transferred to ECI on December 4, 2008. He received his initial classification at ECI on December 16, 2008 with a recommendation that he be transferred from orientation to Job Bank Sanitation. He was classified as medium security. *Id.,* Exs. 1 & 2.

On December 19, 2008, plaintiff received an infraction for being out of bounds and given five days cell restriction. *Id*., Ex. 5. The following day, Plaintiff was placed on administrative segregation due to statements that he was in fear for his life. *Id*. Ex. 6. Plaintiff alleged that his cell mate was holding weapons that were now missing. He advised correctional staff that he had psychiatric problems, he did not want to be housed around gangs, and he wanted to go to Patuxent as recommended by the sentencing court.

Lt. Blake investigated Plaintiff's allegations. No weapons were found when Plaintiff's cell mate's property was packed up. Blake found that "Although I believe that [Plaintiff] is in fear for his life, his driving force seems to be he wants to go to Patuxent." *Id*., Ex. 6. Thereafter, Plaintiff continued on administrative segregation and had his 120-hour segregation review on December 22, 2008. *Id*., Ex. 7. At that time it was recommended that he be transferred from administrative segregation to general population on the East compound only, and remain assigned to job bank sanitation. The recommendation was approved and Plaintiff was returned to general population on the East Compound on December 29, 2008. *Id*., Ex. 1, 2 & 7. At that time, Plaintiff refused his cell assignment stating that he "could not live with Muslims or blacks." He received a notice of

infraction for which he was found guilty and sentenced to sixty days disciplinary segregation. *Id*, Ex. 8.

On February 27, 2009, Plaintiff refused to allow his cell mate to enter the cell and accused the cell mate of slicing Plaintiff's mattress. *Id*., Ex. 9. Plaintiff informed correctional staff that if the cell mate entered the cell someone would be hurt. Plaintiff was served with a notice of rule infraction. At his hearing Plaintiff claimed that he believed his cell mate was going to hurt him. Plaintiff was found guilty of refusing housing and using threatening language. He received 150 days of disciplinary segregation. *Id*. Ex. 9. That evening, Plaintiff was observed cutting his arm and was placed in the Administrative Segregation Observation Area ("ASOA"). He received outside medical treatment during the 11-7 shift on February 28, 2009, and upon his return to the institution was placed back in ASOA. *Id*., Ex. 1 & 10.

On April 9, 2009, Plaintiff was transferred to Patuxent's mental health unit. *Id*. Ex. 1. Plaintiff's annual security reclassification, held on August 3, 2010, recommended that Plaintiff remain classified as medium security and unassigned. *Id*., Ex. 11. On August 9, 2010, a case management team recommended Plaintiff be removed from unassigned and assigned to the job bank. The recommendation was approved on August 11, 2010. *Id*., Ex. 12.

Plaintiff is diagnosed as suffering from bipolar disorder and schizoaffective disorder and is prescribed multiple psychotropic medications. *Id*. Ex. 13 During his four month incarceration at ECI he was seen numerous times by Psychology staff. He was seen in the Psychology Department on December 13, 2008, for medication management. He commented at that time that the medicine was helping. He stated, "At least I haven't tried to kill anybody lately. Sometimes I hear people talking to me. I think people are talking about me and plotting against me; I get irritable." He further stated that he felt calmer on his medication regime and not as angry. Moderate improvement to Plaintiff's condition was noted in terms of his response to medication. Plaintiff was observed to be exhibiting signs of psychosis but not expressing suicidal or homicidal ideation. *Id*.

Plaintiff was seen for suicide monitoring on March 3, 2009, alter he cut himself and made suicidal and homicidal statements. Plaintiff stated that he needed to go to Patuxent where he could get help for his mental health problems. He stated that "they keep putting me in cells with people; I can't be around people." He further stated that he "zapp[ed] out' due to his PCP use and claimed

3

that he used the drug as recently as during his incarceration at JCI, just prior to his transfer to ECI. When was advised that he could be helped at ECI, Plaintiff replied, "No one else can help me except PATX. I can't take it anymore. I just zap out – either I try to kill somebody or myself." Plaintiff's medications were continued and it was determined that Plaintiff required treatment to reduce risk of self harm and harm to others. *Id.,* E. 2 & 13.

Plaintiff was seen by the Psychology Department the following day. It was noted that Plaintiff cut himself with a razor to "get to ASOA." It was further noted that Plaintiff wished to go to Patuxent so that he could "get tied in with his father's old work friends." Plaintiff stated that his father had been a sergeant at Patuxent at one time. It was noted that Plaintiff would be difficult to place in terms of housing because he would act out until he gets where he wants to be, and did not exhibit signs of psychosis or suicidal or homicidal ideation. *Id.*

During his medication review on March 18, 2009, Plaintiff discussed all the drugs he had taken at the former Maryland House of Correction and stated that he was "doing alright." No problems were noted with Plaintiff's medication; however, he requested Wellbutrin because he stated that it helped with his "racing thoughts." He did not exhibit signs of psychosis or suicidal or homicidal ideation *Id*.

Plaintiff was again seen by psychiatric staff for counseling on March 18 and 19, 2009. At that time he reported being upset over the segregation sentence he received at his adjustment hearing. He was provided therapeutic intervention and counseled to give his medication a chance to work. He appeared responsive to intervention and calmer after the session on March 19. He did not exhibit signs of psychosis or homicidal ideation. He did express suicidal ideation but with no current plan or intent. He verbally renewed his safety contract. His medications and treatment plan were continued. Plaintiff was instructed to follow up in three weeks or upon request. *Id.*

On April 5, 2009, Plaintiff attempted to hang himself. Upon his placement in ASOA he attempted to injure himself again by jumping off the sink. He was examined by medical staff and complained of neck pain. His had bruises and red "rope-like" bruising with mild erythema and edema on his neck. Plaintiff was observed to be irritable, anxious, fearful and expressing suicidal ideation. He refused to take medication orally and was therefore restrained and injected with

4

Thorazine. Plaintiff continued under observation and remained in ASOA until he was transferred to Patuxent on April 9, 2009. *Id*. Ex. 1 & 13.

On April 15, 2009, Plaintiff's chart was updated after his individual therapy session. No change was indicated as to Plaintiff's mental status but he did not express suicidal or homicidal ideation. No acute distress was noted and his current treatment plan, including medications, was to continue. *Id*. More recent psychological records demonstrate that Plaintiff continues to receive mental health treatment, including medication and individual therapy. *Id*., Ex. 15.

## Standard of Review

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish Abeyond doubt@ that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1968-69 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 1969. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

**Sovereign Immunity**

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State School and Hospital v. Halderman*, 465 U. S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. State Gov't Code Ann., § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Plaintiff's complaint against the Division of Corrections and Eastern Correctional Institution, agencies within the State of Maryland, is barred by the Eleventh Amendment.

**Medical Care**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments

6

authorized by statute and imposed by a criminal judgment.@ *De=Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a Plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There is no essential distinction between the right to medical care for physical ailment and the right to psychiatric or psychological care for mental ailments. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). Plaintiff, as an incarcerated person, Ais entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.@ *Id.*, at 47B 48. The *Bowring* court further concluded that the right to such treatment is based upon the essential test of medical necessity and not upon a belief is that care is merely desirable. *Id.* at 48. ADisagreements between an inmate and a physician over the inmate's proper care do not state a ' 1983 claim unless exceptional circumstances are alleged.@ *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

The records before the Court demonstrate that Plaintiff has been seen regularly by mental health staff and diagnosed with a variety of mental health problems including bi-polar disorder and schizoaffective disorder. ECF No. 23, Ex. 13. During his incarceration at ECI he attempted self-harm numerous times. Psychiatry notes indicate that some of his behavior appeared to be an effort to manipulate housing. *Id.* Plaintiff has been provided medication to treat his mental health problems as well as therapy sessions with mental health staff. *Id*. The named Defendants, however, have had no personal involvement in Plaintiff's receipt of medical and psychiatric care. Section 1983 liability on the part of supervisory defendants requires a showing that: A(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations.@ *Miltier v. Beorn*, 896 F. 2d at 854 (internal citations

omitted); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) (supervisory liability for an inmate's beating by prison guards). Plaintiff has not alleged that any of the named Defendants had any direct participation in his receipt or denial of medical or psychiatric care. A such, his claim is subject to dismissal. *See West v. Adkins*, 815 F. 2d 993 (4th Cir. 1987).

**Programming/Job Assignment/Transfer to Particular Prison**

It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. A[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.@ *Meachum v. Fano*, 427 U.S. 215, 224 (1976); s*ee also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest). Plaintiff does not have a right to be housed in a particular prison or participate in a particular program, and these allegations must be dismissed.

Likewise, to the extent Plaintiff clams that his assignment to certain prisons prevented his ability to be assigned a prison job, his claim is unavailing. To show a civil rights violation with respect to a prison job assignment Plaintiff would have to show that the actions taken against him impacted on the exercise of a constitutionally protected right. Prisoners, however, do not have a constitutionally protected right to work while incarcerated, or to remain in a particular job once assigned. *See Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992); *Altizer v. Paderick*, 569 F. 2d 812, 815 (4th Cir. 1978). Removing a prisoner from a job simply does not rise to the level of cruel and unusual punishment prohibited by the Eight Amendment. *See Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991).

**Parole**

To the extent Plaintiff maintains that his housing assignment and/or lack of access to programming adversely impacts his parole eligibility, his claim shall be dismissed. Prisoners do not have a liberty interest in parole nor any entitlement to the "minimal procedural safeguards" which may accompany the decision to deny or grant parole. *See Sandin v. Conner*, 515 U.S. 472 (1995); *Paoli v. Lally*, 812 F.2d 1489 (4th Cir. 1987); *Bryant v. Maryland*, 848 F.2d 494 (4th

Cir. 1988). As Plaintiff has no inherent constitutional right to release on parole, any housing or programming decision effecting same fails to state a claim.

## Conclusion

Defendants' Motion to Dismiss or for Summary Judgment shall be granted as to all claims. Plaintiff's complaint against Lt. Ragin shall be dismissed. A separate order follows.

Date: <u>May 19, 2011</u>  _____//s//_____
Alexander Williams, Jr.
United States District Judge